IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | | |
|---|---|---|
| Chris and Deanna Bridges on behalf of F.B. a minor, | ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 7:10-cv-01873-JMC |
| v. | ) ) | **OPINION AND ORDER** |
| Spartanburg County School District Two | ) ) | |
| Defendant. | ) ) ) | |

      This matter is before the court for review of the administrative hearing officer's determination that Plaintiffs' minor son, F.B., was provided a free appropriate public education ("FAPE"), as required by the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, and that they are not entitled to reimbursement or prospective compensation for private placement. The parties have filed a joint certification of the administrative record and cross-motions in support of judgment [Docs. 24 and 25]. After thorough review, the court affirms the administrative hearing officer's determinations.

## FACTUAL AND PROCEDURAL HISTORY[1]

      At the time of the administrative reviews in this case, F.B. was a fourteen (14) year old male in the Ninth grade on a diploma tract taking college preparatory classes. He was in his third year of special education. As a result of a pre-referral screening, it was determined that the child had an

---

[1] The parties do not dispute the basic factual background of this case and the facts recited herein are taken substantially verbatim from the administrative decision of the Local-Level Hearing Officer ("LHO"). The factual recitation was subsequently adopted by the State Review Officer ("SRO"). *See* [Docs. 17-4 and 18-3].

1

average IQ (104) but displayed inconsistent results on various testing which indicated that he may be eligible for Special Education services. Additionally, F.B. had been diagnosed as suffering from Attention Deficit and Hyperactivity Disorder ("ADHD") by Dr. Heyward Nettles, M.D. in September, 2004.

An evaluation was performed by School Psychologist Dr. Martha D. Petoskey in January 2005, in which she found that F.B. exhibited a "low average" IQ (84) utilizing the Wechsler Intelligence Scale for Children. Additionally, other tests given to F.B. placed his abilities and achievement in the average range. A follow-up evaluation in 2007 by Dr. Petoskey produced similar results as the first evaluation and she further found that F.B.'s ADHD was not "adversely affecting his performance in the regular classroom sufficiently to warrant special education services at this time." In August 2007, representatives with Spartanburg County School District Two (the "School District") and Plaintiffs met and formulated an Individualized Education Program ("IEP") for F.B. placing him in regular education classes with accommodations including preferential seating near the teacher, extended time to complete tests, extended time to complete assignments, test/assignments read orally by teacher or assistive technology, a tutor, calculator use on assignments and tests, a copy of all completed notes and an extra set of books for use at home. It also established short term objectives and goals in writing, math and reading to be in a classroom with both a special education and regular education teacher. The IEP was adopted and signed by Plaintiffs. Evaluations of F.B. during the administration of IEP showed some progress.

In April 2008, the School District and Plaintiffs participated in a meeting to review F.B.'s IEP. They agreed to adopt a new IEP for the 2008 school year. In August 2008, the School District held another IEP meeting and Ms. Jennifer Elam, F.B.'s future reading teacher, requested that a

tutorial reading program be added to the IEP. Plaintiffs also requested that the School District discontinue the practice of reading standardized tests to F.B., but that this option remain for the classroom. The School District incorporated these changes into F.B.'s IEP and also added a reading program, Plugged-In to Reading. Plaintiffs signed the modified IEP. Ms. Elam kept a running reading record of F.B.'s progress in the tutorial program which showed improvement by F.B. during the year.

Dr. Ben Rigby performed an independent evaluation in February 2009, at the Speech, Hearing & Learning Center, Inc. in Greenville, South Carolina. Dr. Rigby found that F.B. had an average IQ (95) on the Reynolds Intellectual Assessment Scale and recommended that F.B.'s IEP be modified by adding a second area of disability, i.e. a specific disability in listening comprehension. In April 2009, the School District and Plaintiffs held an IEP meeting. During the meeting, it was agreed that F.B. would be moved from an inclusion/consultant model to a resources model for his education and remain in regular education classes on a diploma tract. In January 2009, a Dominie Reading Assessment was administered by Felicia Oliver showing F.B. reading on a fourth grade level with proficiency, but not able to comprehend material typically used in higher grades. She indicated that F.B. was a fluent reader but he had "no apparent recognition that reading is a meaning-making process." F.B. completed a follow-up Dominie Reading Assessment in July of the same year which showed dramatic improvement.

Plaintiffs enrolled F.B. in two reading programs during the spring and summer of 2009. The reading programs consisted of a Strides program located in Greer, South Carolina at a cost of One Thousand One Hundred Fifty-four and xx/100 ($1,154.00) Dollars and a Lindamood-Bell program in Charlotte, North Carolina at a cost of Eight Thousand Seven Hundred Seventy-Three and 60/l00

($8,773.60) Dollars.  During the 7th, 8th and 9th grades, F.B. had taken Measures of Academic Progress ("MAP") standardized tests and the results were described as mixed.  However, F.B. showed dramatic improvement in the 9th Grade MAP testing over the previous years.  At all times relevant to this matter, F.B. was being educated in regular education classes, was in the Diploma Tract program and received passing grades including in his college preparatory classes.

Plaintiffs were dissatisfied with F.B.'s level of progress under the IEP and made an independent decision to enroll F.B. into the reading programs. Subsequently, Plaintiffs requested the School District to reimburse them for the cost of the programs and pay prospectively for continued treatment in the programs.  The School District declined to reimburse Plaintiffs for the expenses associated with the reading programs.

Plaintiffs initiated a due process hearing by serving on the District a written IDEA due process hearing request on November 11, 2009.  Douglas K. Dent, Esquire, thereafter agreed to serve as the independent LHO.  Following the hearing and the submission of written post-hearing arguments, Mr. Dent issued his decision and Final Order on February 21, 2010, finding that the School District offered F.B. a FAPE and denying Plaintiffs any relief.

Plaintiffs thereafter timely filed an appeal of Mr. Dent's decision to a SRO. The State Department of Education assigned Peter F. Them, Esquire, to serve as an approved SRO.  Mr. Them issued his decision on April 19, 2010, affirming Mr. Dent's decision.  After Mr. Them issued his decision, Plaintiffs objected to the decision by way of email dated April 20, 2010, stating that the decision included a misstatement of the amount of the receipts for the Lindamood-Bell program reimbursement. Mr. Them accepted arguments from the District's counsel opposing the motion for reconsideration of his decision and instead proposing the request be treated as a motion to amend

a decision. Mr. Them amended his decision on May 13, 2010, modifying the amount of reimbursement denied. Mr. Them did not alter the decision in any other manner.

Plaintiffs commenced this civil action on July 19, 2010, challenging the decisions of Messrs. Dent and Them. After the commencement of this action, Plaintiffs withdrew F.B. from the School District in the fall of 2010.

## IDEA FRAMEWORK

The IDEA, which amended the Education of All Handicapped Children Act of 1975, was enacted in 1990 to ensure that all children with disabilities receive a "free appropriate public education." *MM ex rel. DM v. Sch. Dist. of Greenville Co.*, 303 F.3d 523, 526 (4th Cir. 2002). Under IDEA, states must provide disabled children with FAPE or stated otherwise, meaningful access to the educational process, and may be subject to federal education funding restrictions for failing to do so. *Board of Educ. v. Rowley*, 458 U.S. 176, 192 (1982). A state will be considered to have adequately provided FAPE where the educational access provided is reasonably calculated to confer some educational benefit on a disabled child. *Id.* at 207. The IDEA envisions that a disabled child be provided with educational access in the least restrictive, but appropriate environment which will allow the child to participate, insomuch as possible, in similar activities as non-disabled children. *See MM ex rel. DM,* 303 F. 3d at 526*; and* 20 U.S.C. § 1412(a)(5)(A).

While the IDEA requires states to provide disabled children with meaningful access to the educational process, it does not require a state to provide a disabled child with the best or optimal education. *See Rowley*, 458 U.S. at 192. Upon meeting the basic requirements of the IDEA, the state is under no obligation to provide further educational resources. *See MM ex rel. DM,* 303 F. 3d at 526. "That is, while a state must provide specialized instruction and related services sufficient to

5

confer some educational benefit upon the handicapped child, the Act does not require the furnishing of every special service necessary to maximize each handicapped child's potential." *Id*. (internal quotations and citations omitted).

Once a child is determined to be eligible for services, the state must implement an IEP for the eligible child. *Id.* Under the IDEA, the IEP must include an assessment of the disabled child's level of functioning, provide measurable achievement goals, set forth the services to be provided to the child, and establish objective criteria for evaluating the child's progress. *See* 20 U.S.C. § 1414(d)(1)(A). In addition to the substantive requirements for an IEP, the state must also adhere to several procedural safeguards established in the IDEA which endeavor to ensure the opportunity for parental participation in the process of establishing and evaluating the effectiveness of an IEP. *See MM ex rel. DM,* 303 F. 3d at 527. If the parents are dissatisfied with the IEP, they are entitled to request a due process hearing. *See* 20 U.S.C. § 1415(f). South Carolina utilizes a two-tiered review process. The initial due process hearing is conducted before a local hearing officer. The local hearing officer's decision is then appealable to a state-level reviewing officer. *See* 24 S.C. Code Ann. Regs. § 43-243. Thereafter, the state-level decision may be subject to review in state or federal court. *See id.*

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter

of law. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

In reviewing state administrative decisions in IDEA cases, courts have a limited scope of review which requires an independent decision based on a preponderance of the evidence, but giving appropriate weight and deference to the administrative determinations. *See A.B. v. Lawson*, 354 F.3d 315, 325 (4th Cir. 2004); and *Doyle v. Arlington Co. Sch. Bd.*, 953 F.2d 100, 103 (4th Cir. 1991). Generally, when the administrative officer's fact-findings are "regularly made", they are "entitled to prima facie correctness, [and] the district court, if it is not going to follow them, is required to explain why it does not." *Doyle*, 953 F.2d at 105. "The court is not, however, to 'substitute [its] own notions of sound educational policy for those of local school authorities.'" *MM ex rel. DM*, 303 F.3d at 531 (citing *Hartmann v. Loudoun County Bd. of Educ.*, 118 F.3d 996, 999 (4th Cir. 1997)). In a two-tiered administrative review process, the "reviewing court is obliged to accord greater deference" to the administrative findings where "the Hearing Officer and Reviewing Officer have reached the same conclusion." *Id.* (citing *Combs v. Sch. Bd. of Rockingham Co.*, 15 F.3d 357, 361 (4th Cir.1994)).

## DISCUSSION

Under the IDEA, parents may receive reimbursement for private educational services where the state has failed to provide FAPE. *See Florence Co. Sch. Dist. 4 v. Carter*, 510 U.S. 7 (1993); *Sch. Comm. of Burlington v. Dep't of Ed.*, 471 U.S. 359, 369 (1985). Such reimbursement is available only upon a finding that "the public placement violated the IDEA and that the private school placement was proper under the Act." *Id.* at 15.

### A.      Procedural Compliance with IDEA

In evaluating whether a state has provided FAPE in accordance with the IDEA, the court must first evaluate whether the state complied with the procedures set forth in the Act.  *See Rowley*, 458 U.S. at 206-07.  "When [] a procedural defect exists, we are obliged to assess whether it resulted in the loss of an educational opportunity for the disabled child, or whether, on the other hand, it was a mere technical contravention of the IDEA. . . . If a disabled child received (or was offered) a FAPE in spite of a technical violation of the IDEA, the [state] has fulfilled its statutory obligations."  *MM ex rel. DM* , 303 F.3d at 533-34.

Plaintiffs raised several technical concerns relative to F.B.'s IEPs at the administrative hearings, but focus here primarily on whether the goals as stated in the IEP were sufficiently measurable and whether the IEP adequately identified F.B.'s present level of performance.  In support of their claims, Plaintiffs rely particularly on the expert opinion of Dr. Stephanie Trevitz finding that the goals provided by the IEPs were vague and lacked preciseness.  Additionally, Plaintiffs argue that the IEPs impermissibly rely on subjective review and evaluation of F.B's progress under the IEPs.

Neither the LHO nor the SRO substantially addressed the issues concerning the measurability of the goals or the assessment of F.B.'s level of performance.  However, the SRO did find that the procedural defects noted by Plaintiffs did not have a nexus to the ability of the child to have access to meaningful educational opportunities and did not deprive F.B. of FAPE.  The SRO further found that the School District substantially complied with the procedural requirements of the  IDEA.

F.B.'s 2007 IEP provided an assessment of his present level of performance.  It noted that F.B. displayed a lower range of ability in cognitive evaluations, but that his achievement evaluations

in math, reading, and writing were typical for a child of his age. The IEP further indicated F.B.'s ADHD diagnosis and the possible impact of the diagnosis on his testing results. These assessments were based, in part, on standardized testing. The goals provided in the 2007 IEP require F.B. to attain a seventy percent (70%) accuracy level in tasks such as writing essays with defined parts, identify figurative language from reading passages, answer detailed questions concerning reading passages, determining the surface area of three dimensional objects, and determine the slope of lines. Periodic reports during that school year indicated some progress towards the goals established in the IEP.[2]

The 2008 IEP noted that F.B. was performing substantially below his grade level in reading and language and moderately below his grade level in math. Based on standardized testing and teacher observation, the IEP indicates that F.B. exhibited weaknesses in data analysis and reading comprehension. The goals outlined in the IEP include the requirement that F.B. achieve at least seventy percent (70%) accuracy at a fifth grade level in such tasks as writing essays, identifying figurative language from a reading passage, and summarizing and answering detailed questions concerning a reading passage. Additional goals are noted as mastering certain math goals with seventy percent (70%) accuracy on a seventh grade level. Periodic reports based on teacher observation indicate progress towards the IEP goals.

---

[2]The court discusses F.B.'s 2007 IEP only to establish the historical record in this case. Because a two-year statute of limitations applies to Plaintiffs' due process complaint which was initiated in November 2009, they are barred from recovery for any deficiencies alleged in the 2007 IEP which was established in August 2007. *See* 34 C.F.R. § 300.507 ("due process complaint must allege a violation that occurred not more than two years before the date the parent or public agency knew or should have known about the alleged action that forms the basis of the due process complaint").

F.B.'s 2009 IEP includes an analysis of F.B.'s present levels of performance. The 2009 IEP indicates that F.B. was performing several grade levels below his actual grade level. It describes F.B. as having strengths in measurement and data analysis, but struggling with algebra and geometry. The IEP further describes F.B. as having strength in building vocabulary and needing help in the areas of understanding informational and literary texts. Much of the analysis is based on standardized testing results and observations from various School District personnel regarding F.B.'s strengths and weaknesses. The IEP also establishes two distinct goals for F.B. The first goal requires F.B. to identify three potential careers and four things to do in preparation for those careers. The IEP also provides that F.B. achieve a mastery of his general education curriculum with at least eighty percent (80%) accuracy.

Each of the IEPs at issue in this case included a statement of F.B.'s level of performance and statements regarding specific goals of the IEP. Plaintiffs argue that the goals were not sufficiently measurable because they included an element of teacher observation and express desired achievement in terms of a percentage. However, the inclusion of teacher observation does not, in and of itself, make for an ineffective IEP. Additionally, the School District's use of percentages does not automatically deem the IEP deficient. *See Virginia S. ex rel. Rachael M. v. Department of Educ.,* Civil No. 06-00128 JMS/LEK, 2007 WL 80814 (D. Hi. January 8, 2007) (noting that quantifying student's achievement and goals in terms of percentages does not automatically classify an IEP as ineffective); *c.f. Escambia County Board of Education v. Benton*, 406 F. Supp. 2d 1248 (S.D. Ala. 2005) (finding IEP deficient where IEP included multiple procedural errors, including a statement of goals in terms of percentages with no methods of testing, which deprived student of meaningful educational access). A close review of the IEPs reveals that the goal percentages in F.B's IEPs were

10

tied to discrete tasks, such as completing a specific mathematical task, and were often related to a particular reference to a grade level. While the goals were not expressed in the manner that Plaintiffs consider to be the optimal manner, the goals were sufficiently measurable to reasonably gauge F.B.'s progress. However, even assuming Plaintiffs are correct that the School District's statements regarding F.B.'s level of performance and goals were deficient, Plaintiffs have not demonstrated that these technical deficiencies resulted in the loss of an educational opportunity.

    **B.**    **Substantive Compliance with IDEA**

Because the court finds that Plaintiffs' procedural claims are without merit, the next question for the court's consideration is whether the IEP at issue was "reasonably calculated" to enable the child to receive educational benefits. *See Rowley*, 458 U.S. at 206-07.

F.B's IEP provided for multiple accommodations to facilitate his educational process. The accommodations included preferential seating near the teacher and away from distractions to aid in F.B.'s attention problems. F.B. was also allowed to request the teacher read his assignments orally and he was provided additional time to complete assignments and tests. Additional accommodations included allowing F.B. to use calculators and providing him with books for home study. In the 2009 IEP, F.B. was further assisted by teacher notes of classroom instruction, the use of recording devices to record lectures and instructions, and peer tutoring opportunities.

These accommodation demonstrate that F.B. was receiving personalized instruction and services tailored to meet his educational needs. Although F.B.'s grade averages fluctuated during the years of administration of the IEPs, F.B. received passing grades in the general educational curriculum on the diploma tract and continually advanced from grade to grade. *See Rowley*, 458 U.S. at 210 (finding that the provision of personalized instruction and related special education

services combined with evidence that the student was advancing from grade to grade indicated educational progress).

It is clear that Plaintiffs are not satisfied with the School District's offer of FAPE. However, the School District is not required to comply with all of a parent's desires to deliver an IEP that is sufficient or appropriate. *See Shaw v. District of Columbia*, 238 F. Supp. 2d 127, 139 (D.D.C. 2002) (noting that the IDEA does not provide for an education "designed according to the parent's desires") (citing *Rowley*, 458 U.S. at 207) . Therefore, the administrative officers did not err in finding that the IEPs were reasonably calculated to confer educational benefits to F.B.

### C.    Private Placement

Having found that F.B. was not denied FAPE, the court need not address the appropriateness of Plaintiffs' unilateral placement of F.B. in private programs. However, the court will briefly address the issue as an alternative ground for the finding that reimbursement is not appropriate in this case.

In determining whether a private placement is appropriate, the court should evaluate the private placement by the same standard as that used to determine the sufficiency of the state's offer of FAPE. "[W]hen a public school system has defaulted on its obligations under the Act, a private school placement is proper under the Act if the education provided by the private school is reasonably calculated to enable the child to receive educational benefits." *Carter v. Florence County Sch. Dist. Four*, 950 F.2d 156, 163 (4th Cir. 1991)(citing *Rowley*, 458 U.S. at 207) (internal quotations omitted).

Because they found no denial of FAPE, the administrative hearing officers did not substantively address the Plaintiffs' private placement of F.B. The LHO did not address the issue

at all and the SRO concluded only that Plaintiffs had failed to provide sufficient evidence to establish any meaningful benefit of the private program.

In reviewing the record, the court has determined that the Lindamood-Bell program was focused primarily on F.B.'s reading comprehension skills. There is no evidence that Lindamood-Bell provided any services directed at F.B.'s other areas of weakness including mathematical data analysis or problems related to his inability to maintain a productive level of attention to his general education curriculum. However, it is clear that Plaintiffs pursued services from Lindamood-Bell that would close the gap between F.B. and his peers in reading comprehension. While the parties agree that F.B. attained some appreciable level of progress over the summer in reading comprehension, Plaintiffs provided no evidence that these improvements were, in fact, related to his time at Lindamood-Bell as opposed to the accommodations provided to F.B. during the previous school year or the natural maturation process of students. Without more information concerning the programs provided by Lindamood-Bell and there effect on F.B., the court cannot determine that the Lindamood-Bell placement provided the educational benefits required to mandate reimbursement. *See Fairfax County School Bd. v. Knight*, No. 1:05cv1472 (LMB), 2006 WL 6209927, *12 (E.D. Va. August 23, 2006) (finding that a private placement that focused only on reading and writing, but did not provide a comprehensive curriculum, was not appropriate under the IDEA and did not require reimbursement). Therefore, the court agrees with the SRO's determination that Plaintiffs did not sufficiently prove the educational benefit of the private placement. Accordingly, reimbursement was properly denied.[3]

---

[3]The School District encourages the court to dispose of Plaintiffs' claims for reimbursement on the grounds that they failed to provide adequate notice of the private placement. The IDEA does provide certain requirements for parents seeking reimbursement to provide prior notice to the school

13

## Conclusion

After considering the record as a whole, the court concludes that the Local-level Hearing Officer and the State Review Officer did not err in denying Plaintiffs' claim for reimbursement and prospective costs for F.B.'s private placement. The court, therefore, **GRANTS** Defendant Spartanburg County School District Two's Motion for Judgment [Doc. 24] and **DENIES** Plaintiffs Chris and Deanna Bridges' Motion for Judgment [Doc. 25].

**IT IS SO ORDERED.**

s/ J. Michelle childs
United States District Judge

September 2, 2011
Greenville, South Carolina

---

of their intent to remove their child from public school and place the child into private school. However, it is not clear that the notice requirement applies to a parent's procurement of supplemental services. *See, e.g.*, 20 U.S.C. § 1412(a)(10)(C)(iii)(i) (reimbursement may be denied or reduced where parents fail to give the school notice of their intent to remove a child from public school); *see also A.B. v. San Francisco Unified School Dist.*, No. C 07–4738 PJH, 2008 WL 4773417, at *24 (N.D. Cal. October 30, 2008) Therefore, the court declines to dispose of this issue on the basis of any failure to provide notice.